RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CYNTHIA BROWN; CARLOS BUFORD; JENNY SUE ROWE,

*Plaintiffs-Appellees,*

*v.*

No. 25-3179

DAVID YOST, in his official capacity as Ohio Attorney
General,

*Defendant-Appellant.*

───────────────

On Motion to Lift the Stay

United States District Court for the Southern District of Ohio at Columbus.
No. 2:24-cv-01401—James L. Graham, District Judge.

Decided and Filed: April 9, 2025

Before: MOORE, BUSH, and MATHIS, Circuit Judges.

───────────────

**COUNSEL**

**ON MOTION TO LIFT THE STAY and REPLY:** Mark R. Brown, CAPITAL
UNIVERSITY, Columbus, Ohio, Oliver Hall, CENTER FOR COMPETITIVE DEMOCRACY,
Washington, D.C., for Appellees. **ON RESPONSE:** T. Elliot Gaiser, Zachery P. Keller, Katie
Rose Talley, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant.

MOORE, J., delivered the opinion of the court in which MATHIS, J., joined. BUSH, J.
(pp. 21–35), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Ohio Attorney General Dave Yost has eight times rejected a proposed summary of a proposed constitutional amendment, preventing its proponents from circulating a petition and collecting signatures needed to place it on the ballot. Each time, Yost concluded that the petition summary was not a fair and truthful summary of the proposed constitutional amendment.  The district court held that this likely violated the ballot-initiative proponents' First Amendment rights and entered a preliminary injunction ordering Yost to certify two ballot initiative summaries proposed by Plaintiffs here.  However, upon Yost's request, the district court stayed the preliminary injunction pending appeal.  Because we agree with the district court that Plaintiffs' First Amendment rights were likely violated here, and because the other stay factors do not weigh in Yost's favor, we GRANT Plaintiffs' motion to lift the stay and LIFT the stay entered by the district court.

## I. BACKGROUND

### A. Statutory Background

The Ohio Constitution affords Ohio citizens the right to amend the state constitution by way of the ballot initiative process.  Ohio's Constitution and law require that citizens take several steps before they can place a proposed amendment on the ballot.  First, the individuals proposing the amendment ("petitioners") must form a committee to "represent them in all matters relating to [their] petitions."  Ohio Rev. Code § 3519.02.  Petitioners must then submit the proposed amendment, a summary of the amendment, and 1,000 supporting signatures to the Ohio Attorney General for review.  *Id.* § 3519.01(A).  "Within ten days after the receipt of the written petition and the summary of it, the attorney general shall conduct an examination of the summary."  *Id.* The Attorney General must determine if "the summary is a fair and truthful statement of the proposed . . . constitutional amendment."  *Id.*  "This factual determination is the extent of the role and authority of the Attorney General."  *State ex rel. Barren v. Brown*, 365 N.E.2d 887, 888 (Ohio 1977) (per curiam).  If the summary is fair and truthful, the Attorney General "shall so

certify," and then forward the petition to the Ohio ballot board for approval.  Ohio Rev. Code § 3519.01(A).  Following the ballot board's review and approval, *see id.* § 3505.062(A), the proposed amendment again returns to the Attorney General who "shall then file with the secretary of state a verified copy of the proposed . . . constitutional amendment together with its summary and the attorney general's certification," *id.* § 3519.01(A).

Only after the Attorney General files the proposed amendment, summary, and certification with the Secretary of State may petitioners create an "Initiative Petition" and begin collecting signatures in support of the petition.  *See id.* § 3519.05.  For a proposed amendment to qualify for placement on the ballot, petitioners must collect signatures equaling at least ten percent of the total number of votes cast for governor in the last gubernatorial election, amounting to more than 400,000 signatures.  *See* Ohio Const. art. II, §§ 1a, 1g; *Brown v. Yost*, No. 2:24-cv-1401, 2025 WL 815754, at *1 (S.D. Ohio March 14, 2025) ("*Brown V*").  The signatures must be submitted to the Secretary of State for verification at least 125 days before the general election at which the amendment is to appear on the ballot.  Ohio Const. art. II, § 1a.

Petitioners may seek review of the Attorney General's decision on the fair-and-truthful certification in the Ohio Supreme Court.  Ohio Rev. Code § 3519.01(C).  However, the statute does not provide for expedited review in the state court.  *See id.*  And because the signatures must be submitted 125 days before an election, that court's expedited procedure for election cases filed 90 days before the election date does not apply, and the timing of review is left to the discretion of the court.  *See* Ohio S. Ct. R. Prac. 12.08(A)(1).  The result is that petitioners may be unable to obtain review in time to collect signatures for the election in which they seek to participate.

**B.  Factual & Procedural Background**

Plaintiffs are Ohio voters and members of an initiative petition committee who, together, seek to amend the Ohio Constitution through two ballot initiatives.  The first, "Protecting Ohioans' Constitutional Rights," would create a private right of action against state government actors who deprive a person of state constitutional rights, without qualified immunity for the government actors involved.  *Brown V*, 2025 WL 815754, at *2.  The second, "Ohio Wrongful

Conviction and Justice Reform Amendment" would provide remedies for people who are wrongfully convicted and implement reforms aimed at reducing wrongful convictions. *See* R. 47 (Am. Compl., Ex. 7, Initiative Pet.) (Page ID #549–50).

Plaintiffs began collecting signatures for "Protecting Ohioans' Constitutional Rights" four years ago. Eight times over, Plaintiffs gathered 1,000 signatures in support of the proposed amendment and submitted a proposed summary to the Attorney General. *See* R. 47 (Amended Compl. ¶ 19) (Page ID #494–500). Eight times over, "on grounds increasingly dubious," the Attorney General rejected the summary as not fair and truthful. *Brown v. Yost*, 122 F.4th 597, 622 (6th Cir. 2024) (en banc) (per curiam) (Kethledge, J., dissenting) ("*Brown IV*"). Yost faulted the petition summary for myriad issues, including failing to convey clearly the venues in which public officials could be sued and using a title that suggested removing qualified immunity would protect citizens' constitutional rights. *See id.* at 614–15 (Moore, J., dissenting).

In March 2024, Plaintiffs challenged Yost's failure to certify in the Ohio Supreme Court. *See id.* at 600. After that court refused to expedite, Plaintiffs dismissed and filed an action in federal court, claiming that the fair-and-truthful certification requirement, coupled with the lack of timely judicial review, violated their First Amendment rights. *Id.* The district court denied preliminary injunctive relief. *Brown v. Yost*, No. 2:24-cv-1401, 2024 WL 1793008, at *13 (S.D. Ohio Apr. 25, 2024) ("*Brown I*"). A panel of this court reversed. *See Brown v. Yost*, 103 F.4th 420, 425–26 (6th Cir.) ("*Brown II*"), *vacated*, 104 F.4th 621, 622 (6th Cir. 2024) ("*Brown III*"). The panel held that the fair-and-truthful review process likely violated Plaintiffs' First Amendment rights by forcing them to alter the content of their petition summaries and limiting their ability to communicate about their petition with the public. *Brown II*, 103 F.4th at 437–41. The panel ordered Yost to certify the proposed amendment and the most recent summary to the ballot board for the next phase of the process. *Id.* at 446. Yost sought rehearing en banc, which this court granted, vacating the panel opinion. *Brown III*, 104 F.4th at 622.

While the en banc case was pending, Plaintiffs submitted yet another proposed summary to Yost, accepting Yost's latest edits and removing the disputed title from the petition. *See* R. 47 (Am. Compl., Ex. 6, July 15, 2024, Letter) (Page ID #545). Yost rejected it for lack of a title. *Id.* Plaintiffs sued again in the Ohio Supreme Court, which, once again, refused to expedite.

*State ex rel. Brown v. Yost*, 239 N.E.3d 408, 408 (Ohio 2024) (table).    Meanwhile, in an unrelated case, the Ohio Supreme Court held that the Ohio Attorney General lacked statutory authority to review the titles of proposed ballot initiatives.    *State ex rel. Dudley v. Yost*, 250 N.E.3d 50, 60 (Ohio 2024).[1]    A few days later, this court heard en banc the appeal of the preliminary injunction.    After the case was argued but before a decision issued, the Ohio Supreme Court remanded Plaintiffs' pending state court case to Yost for consideration of the title-less initiative.    *State ex rel. Brown v. Yost*, 245 N.E.3d 798 (Ohio 2024) (table).    This court then issued an en banc per curiam opinion holding that Plaintiffs' appeal was moot because the preliminary relief sought was targeted at the November 2024 election, which had already passed. *Brown IV*, 122 F.4th at 601–02.    Shortly thereafter, Yost certified the title-less summary to the ballot board, which confirmed that it contained only one subject, enabling Plaintiffs to begin collecting signatures on that petition.    *See* R. 47 (Am. Compl. ¶ 22) (Page ID #500).

Although the en banc court concluded that Plaintiffs' original motion for a preliminary injunction was moot, the court confirmed that the lawsuit remained live.    *Brown IV*, 122 F.4th at 602.    On remand, Plaintiffs filed an amended complaint relating to the ongoing dispute concerning the "Protecting Ohioans' Constitutional Rights" amendment, as well as the "Ohio Wrongful Conviction and Justice Reform" amendment, which Plaintiffs wished to propose without undergoing the fair-and-truthful review process.    The amended complaint asserts that the fair-and-truthful provision facially violates the First Amendment by giving the Attorney General editorial control over petition summaries and inhibiting circulation until petitioners can achieve the Attorney General's approval or untimely judicial review.    R. 47 (Am. Compl. ¶¶ 44–49) (Page ID #505–08).    Plaintiffs also allege that the statute is unconstitutional as applied to their two ballot initiatives, noting that Yost's review of the "Protecting Ohioans' Constitutional Rights" has prevented them from circulating their initiative, and chilled their efforts to proceed with the "Ohio Wrongful Conviction and Justice Reform" amendment, due to concerns that Yost would do the same.    *Id.* ¶ 50 (Page ID #508).    Plaintiffs also moved for a second preliminary

---

[1]The Ohio legislature recently amended Ohio Revised Code § 3519.01 to clarify that the Attorney General's review does extend to titles.  That amendment takes effect on April 9, 2025, although it will not affect summaries certified before that date.  *See* Ohio Rev. Code § 3519.01(A), (D) (eff. April 9, 2025); *Brown V*, 2025 WL 815754, at *4.

injunction, arguing that immediate relief is needed to allow them the opportunity to collect signatures and place their initiatives on the November 2025 ballot.  R. 40 (2d Mot. for Prelim. Inj.) (Page ID #447).  Plaintiffs express concern that if they circulate the title-less petition, they might later find themselves facing legal challenges to its validity because the Ohio statutes seem to contemplate that any initiative petition *will* contain a title.  R. 40-1 (Mem. of L. in Supp. of 2d Mot. for Prelim. Inj. at 3–4) (Page ID #453–54) (citing Ohio Rev. Code § 3519.05(A)).

Concluding that the fair-and-truthful statute likely violates Plaintiffs' constitutional rights facially and as applied, the district court granted the preliminary injunction.  *Brown V*, 2025 WL 815754, at *8–12.  The court enjoined Yost from applying the fair-and-truthful requirement to either of Plaintiffs' proposed constitutional amendment summaries.  *Id.*  The court further ordered Yost to certify immediately Plaintiffs' preferred versions of the "Protecting Ohioans' Constitutional Rights" and "Ohio Wrongful Conviction and Justice Reform" amendment summaries to the ballot board.  *Id.* at *12.  Yost immediately appealed and moved for a stay of the preliminary injunction.  R. 63 (Notice of Appeal) (Page ID #1749); R. 64 (Mot. to Stay Pending Appeal) (Page ID #1751).

The district court granted the stay for reasons we can only describe as confounding. As the district court recognized, when deciding a motion for a stay pending appeal, the district court considers the same stay factors that apply when this court considers a stay pending appeal—likelihood of success on appeal, irreparable harm, and the balance of equities. *See* R. 66 (Order) (Page ID #1768).  Those factors nearly mirror the factors relevant to determining whether a preliminary injunction is warranted, except that on a stay motion, the party who just *lost* on the preliminary injunction bears the burden.  The district court has already concluded that the party seeking the preliminary injunction is likely to win the case and that, if immediate relief is not granted, the party will face imminent, irreparable harm.  As the Second Circuit has observed, "the grant of a stay of a preliminary injunction pending appeal will almost always be logically inconsistent with a prior finding of irreparable harm that is imminent as required to sustain the same preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999).

Despite reciting the proper test for a stay pending appeal, the district court failed to follow that test. The district court admitted that it was "not in a position to predict whether defendant is likely to prevail on appeal" but instead concluded that this court's prior grant of en banc review suggested that "jurists can reasonably disagree over the issues at stake." R. 66 (Order) (Page ID #1768). The district court further failed to weigh the immediate, irreparable, constitutional harm that it recognized that Plaintiffs were likely to face in its preliminary injunction opinion issued just three days earlier. *Compare id.*, *with Brown V*, 2025 WL 815754, at *11 ("Plaintiffs ultimately might not gather enough signatures, but they have a protectible First Amendment interest in having the opportunity to try."). Finally, the district court rebalanced the equities, now concluding that the state had a strong interest in enforcing the law until the court of appeals could hear the case. R. 66 (Order) (Page ID #1768). Considering the district court's recent opinion recognizing that Plaintiffs were likely to succeed on the merits under existing circuit precedent, and that Plaintiffs were likely to face immediate, irreparable First Amendment harm, the district court's stay amounted to an abuse of discretion. Plaintiffs moved to lift the stay pending appeal. That motion is now fully briefed and ripe for resolution.

## II.  STANDARD OF REVIEW

We review the district court's decision to issue a stay of its preliminary injunction by weighing the traditional stay factors. *Doe 1 v. Thornbury*, 75 F.4th 655, 657 (6th Cir. 2023) (per curiam). "We ask four questions in evaluating whether to grant a stay pending appeal: Is the applicant likely to succeed on the merits? Will the applicant be irreparably injured absent a stay? Will a stay injure the other parties? Does the public interest favor a stay?" *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (per curiam). The applicant bears the burden of demonstrating entitlement to a stay. *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

## III.  ANALYSIS

### A.  Likelihood of Success on the Merits

We begin with the question whether Yost has demonstrated a likelihood of success on the merits of this appeal. We consider this question both under the framework set forth by the

Supreme Court for burdens on "core political speech" relating to ballot amendments, *see Meyer v. Grant*, 486 U.S. 414, 422 (1988), and under the *Anderson-Burdick* balancing test that this court has applied to regulations on the ballot-initiative process, *see Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir. 2019). Either way, Yost is not likely to succeed on the merits of this appeal.

### 1. Meyer v. Grant

Yost is not likely to succeed on the merits of this appeal because the fair-and-truthful certification process allows the Attorney General to exercise editorial discretion over the contents of Plaintiffs' petition summaries. It is beyond question that the circulation of ballot-initiative petitions involves core political speech. *Grant*, 486 U.S. at 421–22. First Amendment protection is "at its zenith" where initiative petitions are concerned, for "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 421, 425 (internal quotation marks omitted). The state may not exercise editorial control over speech concerning initiative petitions. Intrusions on petitioners' exercise of "editorial control and judgment" over the content of those petitions severely infringe First Amendment interests. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

The petition summary is a form of advocacy material used by initiative supporters to persuade electors to sign their petition. The petition summary is not the text of the initiative, nor is it the language that will appear on the ballot, *see* Ohio Rev. Code § 3505.06(E); it is a description of the proposed amendment that appears only on the petition that voters sign to place the measure on the ballot, *id.* § 3519.05(A). The summary follows the title but precedes the chart in which people can sign their names, as well as the full text of the proposed amendment. *Id.* It is accompanied by a certification from the Attorney General indicating that he has deemed it "fair and truthful" but expressing no opinion on the merits of the initiative itself. *Id.* Essentially, the summary is the leading description of the proposed amendment that initiative circulators can rely on to persuade the public to sign the petition. And, indeed, Plaintiffs tell us that "[i]nitiative supporters use the summary to advocate for their cause." D. 9 (Mot. to Lift Stay at 18).

Ohio's fair-and-truthful certification law *requires* that the Attorney General decide what goes into Plaintiffs' circulated petition summary.  Certification of the summary depends on whether, "in the opinion of the attorney general, the summary is a fair and truthful statement of the proposed law or constitutional amendment."  Ohio Rev. Code § 3519.01(A).  In enforcing the statute, the Attorney General can take issue with how petition supporters characterize the proposed amendment, requiring them to include or exclude certain language based on whether, "in [his] opinion," the summary fairly and truthfully reflects the text of the proposed amendment.  *Id.*  As noted, the summary is the language on the face of the petition that Plaintiffs must circulate to collect signatures in favor of their cause.  Effectively, the law allows the Attorney General to control the content of that petition.

As members of this court and the district court have commented, Yost has taken a heavy hand to revising Plaintiffs' "Protecting Ohioans' Constitutional Rights" petition summary.  *See Brown IV*, 122 F.4th at 614 (Moore, J., dissenting) ("[E]ach time, Yost found a nit or two to pick."); *id.* at 622 (Kethledge, J., dissenting) (describing Yost's edits as "increasingly dubious"); *Brown V*, 2025 WL 815754, at *10 (characterizing Yost as an "antagonistic copyeditor").  For example, Yost rejected one proposed summary in part because it was "misleading to the extent that it falsely purports to set forth an exhaustive list of potential venues" when the summary addressed only the venue for lawsuits against one public employee but did not address venue for lawsuits against multiple public employees who do not live or work in the same county.  R. 47 (Am. Compl., Ex. 2, November 17, 2023, Letter at 2) (Page ID #522).  This was misleading, according to Yost, even though it was not in conflict with the proposed amendment itself.  *See id.*  Faced with another rendition of Plaintiffs' proposed amendment, Yost newly asserted that the title, which Plaintiffs included in prior submissions, was misleading because it "offers a subjective hypothesis (that eliminating [qualified immunity] defenses will 'protect' the constitutional rights of citizens) regarding the proposed amendment in lieu of an objective description of its character and purport (that it creates a cause of action notwithstanding those defenses)."  R. 47 (Am. Compl., Ex. 4, March 14, 2024, Letter at 2) (Page ID #535).  Basically, Yost rejected the title because he did not agree that removing qualified immunity would protect citizens' constitutional rights.  This is the very definition of editorial control.

Yost's exercise of editorial control over the contents of Plaintiffs' petition summary implicates the First Amendment. The Supreme Court recently reiterated the central principles in this area of free speech law in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). That case concerned state laws that restricted the content-moderation policies of social-media platforms. *Id.* at 719–21. In remanding for the lower courts to consider further the scope of the laws' applications for purposes of facial challenges, the Court reminded those courts that the First Amendment is implicated when the state seeks to "alter or disrupt" a party's "own expressive activity." *Id.* at 728. The Court emphasized that "the First Amendment offers protection when an entity engaging in expressive activity . . . is directed to accommodate messages it would prefer to exclude." *Id.* at 731. The government cannot justify such intrusions "by asserting an interest in improving, or better balancing, the marketplace of ideas." *Id.* at 732. Those principles find application here. Here, the state acts as editor of the parties' private speech, deciding what can be excluded or included in the petition. Further, the justification is to ensure that the parties' speech is fair, in the view of the Attorney General. Accordingly, the fair-and-truthful certification raises serious First Amendment concerns.

The Supreme Court has applied these principles in the context of ballot initiatives, in Ohio, no less. In *McIntyre v. Ohio Elections Commission*, Ohio tried to defend a statute that prohibited the distribution of unsigned leaflets in connection with a ballot-initiative election. 514 U.S. 334, 337–38 (1995). The Court considered this to be a "direct regulation of the content of speech" because it required the supporters and opponents of a ballot initiative to include the names and addresses of the leaflets' sponsors, thereby altering the content of their advocacy materials. *Id.* at 345. Similarly, here, Ohio law requires petitioners to alter the content of their petition summaries—the leading piece of information on their circulated petitions—in accordance with the preferred speech of the Attorney General. Indeed, the intrusion is especially concerning here because the law provides no guidance to the Attorney General as to what constitutes a "fair and truthful" summary, leaving substantial room for the statute to be implemented in an arbitrary and discriminatory way. *Cf. Forsyth County v. Nationalist Movement*, 505 U.S. 123, 132–33 (1992); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–71 (1988). In sum, determining whether the summary is fair and truthful is an

inherently content-based, subjective judgment that leaves significant room for the exercise of arbitrary decision making.

Yost argues that the First Amendment is not implicated here because the fair-and-truthful certification requirement is just one of the "rules governing . . . the processes for enacting laws by direct democracy." D. 12 (Opp'n to Vacating the Stay at 8). But this rule is unlike most reasonable, nondiscriminatory rules affecting the ballot-initiative process because it concerns the content of a summary that is used as part of petitioners' advocacy in support of a proposed constitutional amendment. To be sure, the creation of a summary is technically part of the ballot-initiative process. A ballot-initiative sponsor cannot move forward with collecting signatures unless they produce a summary. But the summary is unlike many other regulations of the ballot-initiative process that affect how laws get made. The summary is much more like the protected advocacy documents that petition supporters use to promote initiatives, and which the Supreme Court has recognized are protected by the First Amendment. *See McIntyre*, 514 U.S. at 347. Whereas statutes that limit proposed initiatives to single subjects, set a minimum number of signatures that need to be gathered, or create verification processes arguably regulate how citizens can legislate, *see Doe v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring), the petition summary more closely approaches how citizens can advocate for their proposed legislation. The petition summary is more akin to "speech *associated with* an initiative procedure" than "the state's creation of an initiative procedure." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc) (internal quotation marks omitted).

Yost further argues that the First Amendment is not implicated here because the petition summary is government speech. D. 12 (Opp'n to Vacating the Stay at 8). It is not. When ascertaining whether speech can be attributed to the government—and therefore is immune from First Amendment review—the Supreme Court has instructed us to look at (1) "the history of the expression at issue," (2) "the public's likely perception as to who (the government or a private person) is speaking," and (3) "the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). None of those factors cuts in Yost's favor here. Yost has not explained at all how summaries of proposed ballot initiatives have historically conveyed government messages. And, indeed, the whole purpose of

a petition seems to be that citizens wish to influence their government, not to parrot its words. Further, Yost's certification that a summary is fair and truthful hardly suggests that the summary expresses his approved message. *See Matal v. Tam*, 582 U.S. 218, 237 (2017) (rejecting the argument that the content of trademarks is government speech because the "PTO has made it clear that registration does not constitute approval of a mark"). The certification included alongside the summary states that the Attorney General has "certif[ied] that the summary is a fair and truthful statement of the proposed constitutional amendment" but "[w]ithout passing on the advisability of the approval or rejection of the measure to be referred." Letter from Dave Yost to Mark Brown (Nov. 25, 2024), https://perma.cc/2GJG-WTFH. Although Yost has edited the summary, it is still initially and fundamentally the work of the petitioners. The public is not likely to conclude that the summary on a petition seeking legal change can be attributed to the government.

Finally, Yost suggests that fair-and-truthful review is justified by the need to protect the "integrity and reliability" of the initiative process and "combating fraud." D. 12 (Opp'n to Vacating the Stay at 10) (quoting *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191 (1999) ("*ACLF*"); then quoting *Reed*, 561 U.S. at 198). He suggests that the fair-and-truthful-review process is needed to ensure that Ohio voters, confronted with a petition for their signature, can trust the summary of the initiative they are asked to sign. *Id.* We do not question whether the state has a significant interest in combating fraud in the ballot-initiative process. But we have more difficulty concluding that the content-based review undertaken by the Attorney General is narrowly tailored to achieve this purpose. The bar for exercising editorial control over private speech is high. And the availability of alternatives here suggests that such an intrusion may not be warranted. As the Supreme Court noted in *McIntyre*, Ohio's "Election Code includes detailed and specific prohibitions against making or disseminating false statements during political campaigns." 514 U.S. at 349; *see* Ohio Rev. Code § 3517.22. The Supreme Court has recognized that disclosure provisions can have a similarly curative effect, too. *See Grant*, 486 U.S. at 426–27.

We need not weigh in at this juncture on whether the statute will ultimately survive a facial challenge. All that is required to lift the stay is a likelihood of success on Plaintiffs'

as-applied challenge.    Here, Plaintiffs are likely to succeed on their claim that the fair-and-truthful certification process violated their First Amendment rights.    As described above, the record reflects that Yost exercised significant editorial control over the content of Plaintiffs' proposed summary.    And a review of the record makes it difficult to see how that review was tailored to Yost's interest in ensuring that a misleading or fraudulent summary was not conveyed to the public.    This likely violates the First Amendment.

### 2. Anderson-Burdick

Yost is also unlikely to succeed on his claim that the fair-and-truthful certification requirement survives scrutiny under *Anderson-Burdick*.    The Supreme Court has applied *Anderson-Burdick* balancing to regulations of the electoral process, including regulations of the ballot-initiative process.    *See ACLF*, 525 U.S. at 192; *Reed*, 561 U.S. at 212–13 (Sotomayor, J., concurring).[2]    As have we.    *See, e.g.*, *Schmitt*, 933 F.3d at 639.    The *Anderson-Burdick* framework requires us to weigh the "character and magnitude of the asserted injury" against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).    The level of scrutiny we apply is determined by the magnitude of the burden.    If the burden is severe, the regulation will be upheld only if it is "narrowly drawn to advance a state interest of compelling importance."    *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal quotation marks omitted).    By contrast, "[t]he State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions."    *Anderson*, 460 U.S. at 788.

The Supreme Court has recognized that there is no "'litmus-paper test' that will separate valid from invalid restrictions" and that we must carefully "consider the character and magnitude of the asserted injury."    *Id.* at 789.    An election law may severely burden First Amendment rights when it affects a supporter's ability to engage in "core political speech."    *See Grant*, 486 U.S. at

---

[2]Chief Justice Roberts's concurrence in the grant of an emergency stay in *Little v. Reclaim Idaho* has very little to say about the type of regulation at issue here.    That case concerned the number of signatures required to place an initiative on the ballot, "the most typical sort of neutral regulation[] on ballot access . . . almost certainly justified by the important regulatory interests in combating fraud and ensuring that ballots are not cluttered with initiatives that have not demonstrated sufficient grassroots support."    140 S. Ct. 2616, 2616–17 (2020) (Roberts, C.J., concurring in the grant of stay).    That requirement looks nothing like the requirement at issue in this case.

422. Election laws may also impose severe burdens when they "exclude[] or virtually exclude[] electors or initiatives from the ballot." *Thompson v. DeWine*, 959 F.3d 804, 809 (6th Cir. 2020) (per curiam). When determining the character and magnitude of Plaintiffs' injury, we consider "the combined effect of the applicable election regulations." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006).

The fair-and-truthful certification law severely burdens Plaintiffs' access to the ballot. As discussed above, the fair-and-truthful law requires Plaintiffs to undergo content-based review of their proposed petition summary. This affects their core political speech by forcing them to alter the message that they wish to share on a key advocacy document—the initiative petition. Although Plaintiffs can challenge the Attorney General's decision in the state supreme court, there is no requirement that Plaintiffs receive timely review. Realistically, initiative proponents face a choice: accept the Attorney General's perspective on what constitutes a "fair and truthful" summary of their proposed constitutional amendment or refrain from circulating their petition at all. To be sure, Plaintiffs have no federal, constitutional right to amend Ohio's state constitution. *See Reed*, 561 U.S. at 212 (Sotomayor, J., concurring). But their First Amendment interests are burdened when the state subjects their participation in the ballot-initiative process to editorial review. *Cf. Grant*, 486 U.S. at 425 (rejecting the argument "that the power to ban initiatives entirely includes the power to limit discussion of political issues raised in initiative petitions").

Yost argues that the fair-and-truthful certification imposes at most moderate burdens because the law does not restrict speech *outside* of the petition summary. D. 12 (Opp'n to Vacating Stay at 9). But the fact that supporters of a ballot initiative "remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection." *Grant*, 486 U.S. at 424. Particularly so when petition supporters may need to circulate a summary that conflicts with their view of the proposed constitutional amendment. Moreover, the ability to advocate on the importance of the issue at the heart of their proposed amendment is cold comfort if the petition is not certified at all.

Because the burden is severe, strict scrutiny applies. *See Burdick*, 504 U.S. at 434. As we have explained above, Yost seeks to justify the law by the need to protect election integrity

and combat fraud.  D. 12 (Opp'n to Vacating Stay at 10).  But for the same reasons previously expressed, we are doubtful that he can meet his "well-nigh insurmountable" burden to justify such severe intrusions into core political speech.  *Grant*, 486 U.S. at 425.

At the very least, the burden of Yost's enforcement of the fair-and-truthful certification has imposed a severe burden as applied to the Plaintiffs in this case, which suffices for purposes of lifting the stay.  As discussed above, Yost rejected *eight* proposed summaries for reasons that judges on this court and the district court have reviewed and deemed dubious.  Moreover, Plaintiffs have been unable to obtain timely review from the Ohio Supreme Court on two separate instances after Yost opposed expedited consideration.  Plaintiffs have alleged that Yost's intervention caused them to make unwanted changes to their "Protecting Ohioans' Constitutional Rights" amendment summary and has chilled them from submitting the "Ohio Wrongful Conviction and Justice Reform" amendment summary for his review.  R. 47 (Am. Compl. ¶¶ 23, 50) (Page ID #500–01, 508).  Yost's assertion that "[P]laintiffs are free to proceed with signature collection on summary language they submitted in July 2024," D. 12 (Opp'n to Vacating Stay at 9), hardly diminishes the burden, considering that summary contains language that Plaintiffs added at Yost's insistence, and that it lacks a title, a fact that may well affect their advocacy and leave the initiative subject to challenge later in the process, *see* R. 47 (Am. Compl. ¶ 23) (Page ID #500–01).

Further, Yost has failed to show that his fair-and-truthful review is justified as applied to these Plaintiffs.  Yost is presently objecting to Plaintiffs' circulation of a version of the proposed petition that contains seven of his eight rounds of edits and a title that he disagrees with.  Yet, the title—seemingly a significant consideration—did not even present itself in his rejection letters until the seventh one.  This record casts significant doubt on whether the version of the petition that Plaintiffs seek to certify and begin circulating is, in fact, any more likely to mislead, confuse, or defraud potential signatories than the version he finally approved.  The justification fails the smell test.  For these reasons, Plaintiffs are likely to succeed on their facial and as-applied challenges under *Anderson-Burdick*.

**B.  Remaining Stay Factors**

In First Amendment cases, the remaining stay factors usually fall in line with the party who demonstrates a likelihood of success on the merits.  *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).  That logic applies here.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  Plaintiffs face irreparable, First Amendment harm with each day the stay remains in place.  While the stay is in place, Yost need not send Plaintiffs' preferred initiative summary to the ballot board for approval, leaving Plaintiffs unable to begin circulating their petition and collecting signatures in support of the proposed ballot amendment.  This is itself an irreparable harm.  Beyond this, Plaintiffs face irreparable harm based on the diminished likelihood with each passing day that they can qualify this amendment for the November 2025 ballot.  We observe once again that Plaintiffs need to collect more than 400,000 signatures in less than three months to have a chance at making the ballot.  Even if Plaintiffs have no First Amendment right to put their proposed constitutional amendment on the ballot, they are unquestionably, irreparably harmed by the limitation on the time in which they can try.  Yost asserts that the preliminary injunction threatens irreparable harm to the state's "interest in creating and enforcing its own laws."  D. 12 (Opp'n to Vacating Stay at 15) (quoting *Thornbury*, 75 F.4th at 657).  But there is no valid state interest in enforcing unconstitutional laws.

Yost raises a few additional considerations, none of which are persuasive.  First, he argues that allowing Plaintiffs to begin circulating a petition that may be canceled midstream if Ohio prevails could "confuse and mislead voters."  D. 12 (Opp'n to Vacating Stay at 15).  That seems to be a risk assessment that Plaintiffs can make for themselves.  Next, he argues that removing the stay risks presenting voters with a summary that Yost "rejected on fair-and-truthful grounds."  *Id.* at 15–16.  But for the reasons discussed earlier, we find this dubious considering Yost's editing process.  Finally, he argues that the delay in beginning the signature gathering process is not that significant, especially if this court grants expedited review, since this case will draw attention to the petition.  *Id.* at 16.  Worst-case scenario, if Plaintiffs prevail but lack sufficient time to collect signatures, they can proceed in the next election, Yost says.  *Id.*  This

argument also fails because Plaintiffs have a First Amendment interest in circulating their preferred petition.  Moreover, under the reasoning adopted by the en banc court's last per curiam opinion in this case, Plaintiffs' case may be moot again before long, sending Plaintiffs on another cycle through the district court before we might finally reach the merits in time.  Plainly, Plaintiffs prevail on the equities here.

## C.  Response to the Dissenting Opinion

The dissenting opinion raises several arguments in response.  None persuades.  First, the dissenting opinion argues that the First Amendment is not implicated here, because the fair-and-truthful certification requirement regulates "the process by which the people act in a public, sovereign capacity to amend the Ohio constitution."  Dissenting Op. at 24.  That is *not* the law in this circuit.  *See* Dissenting Op. at 28 (acknowledging that "existing precedent" calls for application of *Anderson-Burdick*); *Schmitt*, 933 F.3d at 639.  So, we fail to see how the dissenting judge's "question[s] [about] whether *Anderson-Burdick* applies" in the ballot-initiative context make Yost likely to succeed on the merits at this stage.  Dissenting Op. at 28 (internal quotation marks omitted).  Likewise, we note that the dissenting opinion does not at all contend with (or even address) the district court's misapplication of the stay factors.

Second, the dissenting opinion insists that regulation of the petition summary "does not regulate the communicative conduct of persons advocating a position on the initiative."  Dissenting Op. at 24.  In the dissenting opinion's view, all ballot-initiative challenges can be categorized as internal or external to that process.  Unfortunately, this law does not fall neatly on one side of the line or the other.  Approval of the summary is unquestionably a step toward placing an initiative on the ballot under Ohio law.  But it is also the language on a petition that proponents circulate in their attempts to advocate and collect signatures for their initiative. *See Reed*, 561 U.S. at 195 (rejecting the position that the legal effect of expressive activity strips it of First Amendment protection).

That this law affects both sides of the line is not a barrier to First Amendment review. *Grant* and *ACLF* demonstrate that the First Amendment applies even if the speech is made within the lawmaking part of the ballot-initiative process.  In *Grant*, the Court considered a law

prohibiting proponents of an initiative from paying circulators to seek signatures. 486 U.S. at 417. In *ACLF*, the Court considered a law requiring those petition circulators to wear identification badges while they collected signatures. 525 U.S. at 197–98. Under the dissenting opinion's theory, such laws impose no First Amendment burden, for the circulators are simply engaged in the lawmaking process. Because they are actively collecting signatures, not simply discussing the merits of the issue, they warrant no First Amendment protection under the dissenting opinion's theory. But the Court has already rejected that sweeping position, holding in *Grant* that the state's creation of the ballot-initiative process does not give the state unlimited power to regulate speech connected with that initiative. 486 U.S. at 424–25. Applying that principle in both *Grant* and *ACLF*, the Court recognized that the First Amendment limited state law because the proponents and petition circulators were engaged in speech, even though their speech was in service of the ballot initiative. *Id.*; *see ACLF*, 525 U.S. at 197–200. Indeed, in *ACLF*, the Court drew a comparison with *McIntyre*, a case concerning the distribution of anonymous handbills "urging voters to defeat a ballot issue." *ACLF*, 525 U.S. at 199. The Court considered the "restraint on speech in [*ACLF*] more severe than [] the restraint in *McIntyre*" because the circulator must engage in a lengthy encounter to persuade an elector to sign a petition, an encounter that "'of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.'" *Id.* (quoting *Grant*, 486 U.S. at 421). Similarly, here, even if the petition summary is part of the lawmaking process, that fact does not necessarily draw it outside of the First Amendment.

Third, the dissenting opinion claims that our stance draws us into conflict with other circuits. But the out-of-circuit cases cited by the dissenting opinion are easily distinguishable. Those cases considered limitations that states have placed on the subject matter of allowable ballot initiatives. *See Initiative & Referendum Inst.*, 450 F.3d at 1103–04; *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 85–86 (D.C. Cir. 2002); *Wellwood v. Johnson*, 172 F.3d 1007, 1009–10 (8th Cir. 1999). In effect, those states dictated the types of laws that can be enacted by initiative. The Ohio law here, by contrast, concerns the text of a summary that petitioners use as part of their advocacy efforts, making it more like the laws at issue in *McIntyre*, *Grant*, and *ACLF*, which affected the ability of ballot-initiative proponents and opponents to share their message. The dissenting opinion's suggestion that we have

"resurrect[ed]" the "political process doctrine," Dissenting Op. at 27 & n.8, is similarly misplaced because we have not passed on Ohio's ability to decide what kinds of laws that can be enacted through the initiative process. *See Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary*, 572 U.S. 291 (2014).

Fourth, the dissenting opinion characterizes our opinion as suggesting that the Attorney General violates the First Amendment by exercising "power to exclude certain topics or viewpoints from the ballot." Dissenting Op. at 25. To be sure, we are concerned that Yost has not implemented the fair-and-truthful certification in "neutral" way. *Little*, 140 S. Ct. at 2616 (Roberts, C.J., concurring in the grant of stay); *cf. Thompson*, 959 F.3d at 808 (applying *Anderson-Burdick* to "nondiscriminatory, content-neutral ballot initiative requirements"). And we are surprised by the dissenting opinion's eagerness to endorse Yost's dubious conduct here. But this case does not present the straightforward question whether Ohio law violates the First Amendment by giving the Attorney General largely unfettered discretion to deny petitioners access to the ballot-initiative process. Here, as we have explained, state law authorizes the Attorney General to control the text of the summary, a document that is an essential part of petitioners' advocacy. Moreover, approval of that summary is a required condition that Plaintiffs must achieve if they are to begin circulating their petition at all and sharing their speech in favor of the proposed amendment, rather than just the issue on which the amendment is predicated. That is why the law here likely burdens Plaintiffs' private speech directly under *Grant* and places a severe burden on their ability to participate in the ballot-initiative process under *Anderson-Burdick*.

Fifth, reluctantly applying *Anderson-Burdick* to this case, the dissenting opinion contends that Yost can edit the summary as he sees fit because the summary is government speech, analogizing the petition here to an electoral ballot. Dissenting Op. at 28–29. But the dissenting opinion's analogy to a ballot only underscores its differences. A voter receives a ballot from a polling official within a government-sponsored polling place. That ballot is replete with official language and warnings. By contrast, an elector confronts a ballot-initiative petition in public, in the hands of a proponent of that measure. As the dissenting opinion acknowledges, the petition

might even be accompanied by additional materials advocating in favor of the measure.  Further, electoral ballots, like the license plates at issue in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, "have traditionally been used for government speech," indicating that the government "explicitly associates itself with the speech."  576 U.S. 200, 216 (2015).  Contrast that with a circulated petition, which more closely resembles the pamphlets and surveys recognized as core private, political speech.  *See McIntyre*, 514 U.S. at 347.

Sixth, the dissenting opinion argues that even if the summary is construed as private speech, it involves at most speech within a public-benefit program.  Dissenting Op. at 31–32.  The unconstitutional-conditions cases upon which the dissenting opinion relies are largely inapposite.  That line of case law recognizes limits on the government's ability to condition funding on the recipient's speech.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  Although the government may impose "conditions that define the limits of the government spending program," the government may not impose "conditions that seek to leverage funding to regulate speech outside the contours of the program itself."  *Id.* at 214–15.  Those cases arise in the context of government funding programs and rest principally on the government's ability to define the scope of its own initiatives, compared with the recipient's ability to use the government's program to advance its own, private aims.  *See, e.g.*, *id.* at 217–19 (HIV/AIDS funding); *Rust v. Sullivan*, 500 U.S. 173, 196–99 (1991) (family-planning funding); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549–51 (1983) (tax breaks for charitable organizations).  In stark contrast here, the "program," so to speak, is a state constitutional right to advance legislation by citizen initiative.  The state plainly does not seek to advance an initiative as the government did in those cases.  In any event, the speech here does not sit neatly "'inside' the government program," as the dissenting opinion suggests.  Dissenting Op. at 32 (quoting *Agency for Int'l Dev.*, 570 U.S. at 215).  As we have discussed, the petition summary is at once part of the initiative process and part of petitioners' advocacy.  Its connection to the formal process does not deprive it of First Amendment protection.

## IV.  CONCLUSION

For the foregoing reasons, we GRANT the motion to lift the stay and LIFT the district court's stay.

---------------------------

**DISSENT**

---------------------------

JOHN K. BUSH, Circuit Judge, dissenting.  I would deny the motion to vacate the stay of the district court's injunction.  All the relevant legal factors support continuance of the stay.  The driving consideration here is that the Ohio Attorney General is likely to prevail in this action because the First Amendment does not bar the State from regulating the content of a certified initiative summary.  The summary is a legislative action that, at most, constitutes government, not private, speech.  But even if it were private speech, the Attorney General's regulation of its content would still be permissible because the summary would constitute speech that occurs within a discretionary government benefit program, which the Supreme Court has held may be subject to content-based regulation.  I explain these points more fully below.

## I.

Plaintiffs are members of petition committees that seek to advance two different state constitutional amendments through Ohio's initiative process.  They object, however, to Ohio's requirement that a petition may proceed only if it first receives a certified summary from the Attorney General.  In their view, that content-based restriction on the initiative process is inconsistent with the First Amendment's prohibition, applied through the Fourteenth Amendment, on laws "abridging the freedom of speech."  U.S. Const. amend. I; *see also* U.S. Const. amend. XIV, § 1.  So, they want to compel the Attorney General to certify two particular summaries that have been or will be submitted alongside their petitions without determining whether the summaries are fair and truthful under Ohio law.

Plaintiffs' two proposed amendments have taken distinct paths from each other so far.  One proposed amendment, which seeks to address wrongful convictions, has not yet been submitted to the Attorney General.  But the second proposed amendment, which aims to expand state-law remedies for violations of state constitutional rights, has gone to the Attorney General for review on numerous occasions.  For the most part, the Attorney General has refused to certify Plaintiffs' submissions because, in his view, the proposed summaries failed to comply with Ohio

law. Plaintiffs disagree. They claim their submissions do comply and that the Attorney General's rejections of their submissions suggest a viewpoint-based restriction on their exercise of Ohio's initiative process.

Notably, the Attorney General, acting pursuant to an Ohio court order, has certified one of the proposed summaries for the second proposed amendment. That certified submission contains the exact same proposed amendment at issue in Plaintiffs' other rejected submissions. So, the certification permits Plaintiffs to move forward in the initiative process with their proposed amendment and solicit the signatures necessary to place the amendment on the ballot. But, despite their ability to do so, Plaintiffs have refused to gather signatures in support of their proposed amendment. They prefer to proceed with their First Amendment challenge.

And this dispute has been proceeding for quite a while. The case previously came before this court after the district court initially denied Plaintiffs' motion to preliminarily enjoin the Attorney General from enforcing the certification provision. *See Brown v. Yost*, 122 F.4th 597, 600–01 (6th Cir. 2024) (en banc) ("*Brown II*"). After the en banc court held that subsequent events rendered the motion moot, *id.* at 601–03, Plaintiffs returned to the district court and renewed their motion, this time requesting preliminary relief not exclusively tied to a particular election cycle.

Reversing course, the district court granted Plaintiffs' motion, holding that the certification provision violated the First Amendment. *Brown v. Yost*, No. 2:24-CV-1401, 2025 WL 815754 (S.D. Ohio Mar. 14, 2025) ("*Brown III*"). The court first concluded that the summaries, even when they are made part of the official initiative petition after the Attorney General's certification, constitute core political speech of the petition committee members. It then held that the law requiring the Attorney General to certify the summary for the petition to advance in the initiative process could not survive First Amendment scrutiny.

## II.

To decide whether to maintain the stay of the preliminary injunction, we address the four factors of likelihood of success on the merits, irreparable harm, balance of the equities, and the

public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).  The key issue here is the first one: which side is likely to prevail on the merits?

To address this question, we should begin by going back to relevant first principles in our American system of governance.  The federal Constitution creates no right for citizens at the state level to act in a sovereign capacity and make state law by ballot initiative.  *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993).  Instead, the federal Constitution leaves to each state a near-limitless authority to structure, distribute, and regulate the exercise of that state's legislative power as the state sees fit.  *See* U.S. Const. art. IV, § 4.

Through its own sovereign choice, the people of Ohio chose to vest the State's legislative power primarily in the hands of the General Assembly, its body of elected representatives. *See* Ohio Const. art. II, §1.  But the Ohio Constitution also permits the people—as an electorate and subject to regulations that the State's elected officials may impose—to act in a sovereign, legislative capacity to make law, including constitutional law, through an initiative process. Ohio Const. art. II, §§ 1a, 1b.  When the people of Ohio choose to avail themselves of that power, they do not act in a private capacity; they act like a legislature, as the sovereign's lawmaking body.  *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 805–08, 813–24 (2015).  And importantly, "a legislator has no right to use official powers for expressive purposes."  *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011).

The Ohio General Assembly implemented a framework for the people to engage in the direct exercise of legislative power via the initiative process.  Citizens interested in enacting a constitutional amendment through an initiative must first designate a committee of three to five people to act as their representatives.  Ohio Rev. Code § 3519.02.  To begin a petition's movement through the legislative process, the committee must submit a petition for the Attorney General's review.  Ohio Rev. Code § 3519.01(A).  It must contain the proposed amendment, a summary, and supporting signatures from at least 1,000 qualified Ohio electors.  *Id.*  A petition may only advance through the legislative process if, upon submission, the Attorney General examines the summary and determines that it is a "fair and truthful statement of the proposed . . . constitutional amendment."  *Id.*  Once certified, the summary forms part of the official

"petition," a state form that Plaintiffs must use to gather the signatures required to place an initiative on the ballot.

The First Amendment poses no barrier to the Ohio Attorney General's involvement in the certification process. That is because the First Amendment has little to say about the power of a state government to structure the exercise of its legislative power and, in particular, to establish and regulate a fundamental aspect of that power—its state constitutional amendment process. As federal judges, we might not agree with the merits of the Ohio Attorney General's actions. But it is *state* law—through its constitutions, statutes, and rules—not federal law that regulates the Attorney General's conduct.

And Ohio law does, in fact, prescribe the process by which the people act in a public, sovereign capacity to amend the Ohio Constitution. As an original matter, Ohio law governing the initiative process does not impinge upon any First Amendment right held by initiative proponents, particularly where, as here, the law does not regulate the communicative conduct of persons advocating a position on the initiative. *See Brown II*, 122 F.4th at 605–13 (Thapar, J., concurring); *Brown v. Yost*, 103 F.4th 420, 454 (6th Cir. 2024) (Bush, J., dissenting) ("*Brown I*"); *Schmitt v. LaRose*, 933 F.3d 628, 644, 648–49 (6th Cir. 2019) (Bush, J., concurring in part & concurring in the judgment); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1098–1104 (10th Cir. 2006). "[A]lthough the First Amendment protects public debate about legislation, it confers no right to legislate on a particular subject." *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002). Because that is Plaintiffs' fundamental complaint here—that the Attorney General's summary approval power makes it more difficult to enact particular initiatives—their Free Speech Clause claim must fail. Any redress against the Attorney General lies in state, not federal, court, based on state, not federal, law.

*Meyer v. Grant* is not to the contrary. 486 U.S. 414 (1988).[3] Unlike the law at issue there, Ohio law does not regulate private speech that occurs within the initiative circulation

---

[3]In extending *Grant* to this case, the majority creates a split with the Eighth, Tenth, and D.C. Circuits, all of which have held that *Grant* does not apply to content-based restrictions on the initiative process. *See, e.g., Wellwood v. Johnson*, 172 F.3d 1007, 1009–10 (8th Cir. 1999); *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir. 1996); *Walker*, 450 F.3d at 1099, 1103–04; *Marijuana Pol'y Project*, 304 F.3d at 86–87.

process itself.  Nothing in the Ohio statute challenged here prevents petition circulators from engaging in their own speech that the Attorney General objects to or considers "unfair" or "untruthful."  "Indeed, proponents can say whatever they please to get their message out." *Brown II*, 122 F.4th at 608 (Thapar, J., concurring).  They just may not say it on an official state form, which is what the certified petition, including the summary, is.

So, unlike in *Grant*, the law here does not place "a limitation on communication with voters" by private citizens.  *Taxpayers United for Assessment Cuts*, 994 F.2d at 295.  In fact, nothing in Ohio law prevents Plaintiffs from handing a potential signatory Plaintiffs' own preferred summary at the same time they present the petition, which includes the Attorney General's certified summary.[4]  Plaintiffs may even tell the signatories that the Attorney General's certified summary is not a truthful description of their petition and that their own private summary provides the voter with more accurate information.[5]

Plaintiffs and the majority also suggest that the Attorney General's exercise of his statutory review power towards Plaintiffs' own initiatives raises First Amendment concerns because he is exercising his power to exclude certain topics or viewpoints from the ballot.  But the Free Speech Clause creates no constitutional right to place initiatives of particular topics or viewpoints on state ballots.  That makes sense because laws are filled with content- and viewpoint-based restrictions on the exercise of legislative power.  *See Walker*,

---

[4]If it did, that is the type of law that *McIntyre v. Ohio Elections Commission* would prohibit.  *See* 514 U.S. 334 (1995) (holding an Ohio law that prohibited the distribution of unsigned leaflets in connection with a ballot-initiative election was inconsistent with the First Amendment).  But since Ohio law leaves Plaintiffs free to engage in any speech regarding initiatives that they wish, the majority's reliance on *McIntyre* is misplaced.  The same is true for *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999).  *See Brown II*, 122 F.4th at 611–12 (Thapar, J., concurring) ("*Buckley* thus stands for the unremarkable proposition that regulations of political expression trigger First Amendment scrutiny.  Ohio's law, by contrast, does not regulate political expression.  Plaintiffs here remain free to make the same amount of political expression, using the same methods, as they would be able to make without the certification provision.").

[5]Nonetheless, the majority suggests the certification provision limits communication with voters because proponents, allegedly, rely on the certified summary to advocate for their initiative.  But Plaintiffs point to no clear evidence of such reliance, and the affirmative evidence in the record is to the contrary.  *See Brown III*, 2025 WL 815754, at *10 n.11 (noting record evidence claiming potential signatories rarely read the certified summary for informational purposes).  Even if the solicited signers did rely on the summary, as explained below, Plaintiffs have failed to explain how they have a constitutional right to commandeer an official government document to communicate their own private message.

450 F.3d at 1100–01; *Brown II*, 122 F.4th at 606–07 (Thapar, J., concurring); *Schmitt*, 933 F.3d at 646–47 (Bush, J., concurring in part & dissenting in part).[6]

Take, for example, rules regarding what legislation can be enacted via congressional reconciliation procedures, which make it easier to pass legislation with a bare majority in each House of Congress.  The Byrd Rule prevents using that process to enact "extraneous" legislation—legislation that does not impact spending or revenue—and delegates to the Senate Parliamentarian the power to determine whether a provision fits within that category.  No one thinks that when the Parliamentarian's ruling prevents a provision from moving forward in the reconciliation process that a First Amendment violation has occurred, even though those rulings are content based and prevent certain types of legislation from moving forward.  Ohio's certification law places the Attorney General in a similar position: he stands as an arbiter of which petition submissions may move forward in the legislative process.  That he may regulate this process based on content or viewpoint offends no First Amendment principle.[7]

In concluding otherwise, the majority creates a circuit split with the Tenth and D.C. Circuits, both of which have squarely rejected First Amendment claims against laws erecting barriers that prevented initiatives of particular viewpoints from reaching the ballot.  *See, e.g.*, *Walker*, 450 F.3d at 1103–04; *Marijuana Pol'y Project*, 304 F.3d at 85–87; *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir. 1996).  And it also departs from the Supreme Court's decision in *Gordon v. Lance*, where the Court held that a West Virginia viewpoint-based

---

[6] *Walker* and the *Brown II* concurrence primarily discussed content- and viewpoint-based barriers to the exercise of legislative power that are found in state constitutions.  But from a First Amendment perspective, there is no meaningful distinction between 1) state constitutional provisions that erect content- or viewpoint-based barriers to placing initiatives on the ballot and 2) state statutory or regulatory provisions that impose the same barrier.  The Fourteenth Amendment applies First Amendment principles to all state action, no matter what source of state law that action was taken pursuant to.  So, as far as the First Amendment is concerned, there is no meaningful distinction between 1) a state constitutional provision that permits an initiative to be placed on the ballot only if the legislature, by a majority vote, first deems it to be "in the public interest" and 2) Ohio's requirement that the petitions be placed on the ballot only if the Attorney General first finds a summary to be "fair" and "truthful."  In other words, nothing in the Free Speech Clause would preclude the Ohio legislature from granting the Attorney General, as a matter of state law, a veto-like power to prevent legislation proposed by initiative from advancing in the legislative process.

[7] Whether the Attorney General is acting within the scope of his statutory authority is a question of state law over which the federal Constitution is agnostic.  *See Brown II*, 122 F.4th at 608 (Thapar, J., concurring) ("[T]he First Amendment doesn't stop a state from delegating discretion to an executive official like the state Attorney General to limit or prohibit citizen lawmaking.").

limitation on its referendum process that made it more difficult to enact policies raising taxes, but not lowering them, did not violate the Fourteenth Amendment "or any other provision of the Constitution." 403 U.S. 1, 8 (1971).[8]

Stripped of any Free Speech Clause significance, Plaintiffs' content- or viewpoint-discrimination claim boils down to nothing more than an argument that the Attorney General is incorrectly interpreting and applying state law. As noted, the remedy for that is to go to state court. Sovereign immunity typically precludes federal courts from awarding injunctive relief against state officials based upon alleged violations of state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984). And there is no general federal constitutional right to have state officials properly interpret and apply state law, even in the election context. *Cf. Moore v. Harper*, 600 U.S. 1, 34–36 (2023). Even apart from the merits, *Pullman* abstention would stand as a serious barrier to litigating the merits of the underlying state-law question in federal court. *See R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941); *Harrison v. NAACP*, 360 U.S. 167, 176–78 (1959).[9]

---

[8]The novelty of Plaintiffs' viewpoint-discrimination reasoning is its striking resemblance to the now largely interred "political process doctrine." Under one view of that doctrine, a state violated the Constitution any time it erected a structural barrier that made it more difficult to advance a particular viewpoint held by a disfavored group through the legislative or electoral process. The Supreme Court rebuked this court's expansive application of that doctrine in *Schuette v. Coalition to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary*, 572 U.S. 291 (2014), where the plaintiffs challenged a Michigan constitutional amendment that made it more difficult to advance pro-affirmative action policies.

What fools, it turns out, the plaintiffs were in *Schutte*. If only they had styled their claims as First Amendment viewpoint-discrimination claims, then, under the majority's rule, they would be entitled to strict scrutiny and an all-but-assured victory. That would have been a much more straightforward theory than the highly circumscribed political process doctrine.

That the Supreme Court has erected an independent doctrine to address scenarios where political actors make it more difficult for groups seeking to legislatively advance particular viewpoints, and then severely circumscribed the scope of that doctrine, suggests that the First Amendment does not provide an alternative, simpler avenue to advance the same types of arguments. *Cf. Wellwood*, 172 F.3d at 1009–1010 (rejecting the extension of the political process doctrine in the context of a First Amendment challenge to a state law that imposed a content-based restriction on the initiative process). Today's majority resurrects, breathes new life into, and radically transforms the political process doctrine into a far reaching First Amendment tool that calls into question almost any content- or viewpoint-based limitation on the exercise of legislative power at the state and federal level.

[9]It is notable that, when this case was previously before us, Plaintiffs did not challenge the Attorney General's interpretation and application of the statutory provision to their summaries. *See Brown I*, 103 F.4th at 446 & n.1 (Bush, J., dissenting). A conclusion that the district court had found was essential to stave off *Pullman* abstention. *See Brown v. Yost*, No. 2:24-CV-1401, 2024 WL 1793008, at *3–4 (S.D. Ohio Apr. 25, 2024).

Put simply, Plaintiffs are not likely to succeed on the merits because the First Amendment does not inhibit the State's power, through the Attorney General, to control the content of the official government summary as part of its regulation of the initiative process.

## III.

This court's existing *Anderson-Burdick* precedent does not change this conclusion that the Attorney General's role is consistent with the First Amendment. Like many other members of this court, I have "questioned whether *Anderson-Burdick* applies to anything besides generally applicable restrictions on the right to vote." *Thompson v. DeWine*, 959 F.3d 804, 808 n.2 (6th Cir. 2020); *see, e.g.*, *Schmitt*, 933 F.3d at 644, 648–49 (Bush, J., concurring in part & concurring in the judgment). But even under our existing precedent, and even were *Anderson-Burdick* applicable here, a plaintiff must first establish under that doctrine that the challenged law imposes a burden on the plaintiff's First Amendment rights. *See Schmitt*, 933 F.3d at 639 (majority).[10] Plaintiffs have not done so.

## A.

*First*, to the extent that a certified summary constitutes anyone's "speech" under the First Amendment, it is the government's speech, not Plaintiffs' private protected speech. The certified summary forms part of the official "petition," a government document that Plaintiffs must use to gather the signatures required to place an initiative on the ballot. Ohio Rev. Code § 3519.05. And Plaintiffs have failed to explain why they have a First Amendment right to express whatever speech they would like on the State's own official election document. *Cf. Colorado v. Griswold*, 99 F.4th 1234, 1240–42 (10th Cir. 2024).

An analogy to ballots confirms this point. As we and the Supreme Court have both held, a ballot is not a forum for private political speech. *See Timmons v. Twin Cities Area New Party*,

---

[10]The majority claims I acknowledge that "existing precedent calls for application of *Anderson-Burdick*." Majority Op. at 17. But as a matter of stare decisis, I am aware of no case in which this court has held that the *Anderson-Burdick* framework applies to a content-based regulation on the scope of the initiative process. And for the reasons I've explained, extending *Anderson-Burdick* to this context would conflict with core principles of state sovereignty and the precedent of several other circuits. In any event, as I explain below, even under *Anderson-Burdick*, Plaintiffs are not likely to succeed on the merits because they have not established that the challenged law imposes a burden on their First Amendment rights.

520 U.S. 351, 363 (1997) (holding political parties have no First Amendment "right to use the ballot itself to send a particularized message"); *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 336 (6th Cir. 2016) (holding that "a political party has no First Amendment right to use the general-election ballot for expressive activities"). So, the language that a state chooses to place on a ballot constitutes government speech, not private speech.

Similar logic applies here. Just as candidates cannot say whatever they want on the official ballot, petition circulators likewise cannot say whatever they want on the official petitions, of which the certified summaries are a part. And likewise, no First Amendment issues arise because both groups remain "free to provide . . . a plethora of information" about the candidates or initiatives in any other conceivable way. *Ohio Council 8 Am. Fed'n of State*, 814 F.3d at 335. Plaintiffs are free to lobby, petition, and engage in all First Amendment-protected activities to advocate for their proposed amendment. The regulation of the certified summary does not affect this private speech in any way.[11]

Nor, at this stage, have Plaintiffs demonstrated that the public would perceive the certified summary as private speech. *See Shurtleff v. City of Boston*, 596 U.S. 243, 252, 255 (2022). In fact, the certified summary explicitly states that it is the Attorney General—not any private citizen—who has certified the summary.[12] This is reiterated by the fact that the first name listed on or below the petition summary is the Attorney General. *See, e.g.*, Ex. 1 to Am. Compl., R. 47, PageID 515–16. There is no indication in the certified summary that the petition

---

[11]The majority claims the possibility that a petition might be accompanied by additional materials advocating in favor of an initiative somehow suggests that the public would perceive the certified summary as Plaintiffs' own speech. *See* Majority Op. at 19–20. How that is so is quite unclear. If anything, the presence of materials in addition to the certified summary would suggest that the certified summary does not convey Plaintiffs' message. If it did, there would be no need for additional materials.

[12]Nor does it matter, as the majority suggests, that the summary states that the Attorney General has certified the summary "without passing on the advisability of the approval or rejection of the measure to be referred." When a petition or candidate ends up on a general election ballot, no one necessarily thinks that the existing state government thinks it is a good idea to elect the candidate or approve the petition. In fact, since the ballot offers alternatives to the status quo, one might reasonably think the existing government is against those alternatives. And yet the ballot language itself is government speech.

committee originally drafted it or even that the committee necessarily agrees with the summary.[13]

Additionally, like a ballot, the certified petition, including the summary portion, "is replete with official language and warnings." Majority Op. at 19. Anyone handed an initiative petition will see a boldface type legal warning that "[w]hoever knowingly signs this petition more than once; except as provided in section 3501.382 of the Revised Code, signs a name other than one's own on this petition; or signs this petition when not a qualified voter, is liable to prosecution." *See* Pet. for Initial Hearing En Banc, Dkt. 13, at 10. Likewise, as explained above, when one flips to the part of the petition displaying the certified summary, one will be met with the official language concerning the Attorney General's certification. As the majority recognizes, these are qualities that the public often associates with government, not private, speech. *See* Majority Op. at 19.

True, the initiative proponents themselves initially draft the summaries, and the Attorney General typically adopts what the proponents propose. But the public doesn't know that from the summary. Although private involvement is sometimes relevant in the government speech analysis, the Supreme Court has made clear that it is not always so. *See Shurtleff*, 596 U.S. at 252 ("[T]o determine whether the government intends to speak for itself or to regulate private expression . . . we conduct a holistic inquiry" that "is driven by a case's context rather than the rote application of rigid factors."); *id.* at 262 (Alito, J., concurring in the judgment) (noting the factors outlined in the Court's government speech precedents "d[o] not set forth a test that always and everywhere applies"). Thus, in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the Supreme Court held that specialty license plates constituted government speech, even though the messages on them were proposed by private entities. 576 U.S. 200 (2015). The Court held that the government speech label applied even though private parties created the specialty plate designs in the first instance and, as the dissenters discussed at length, the government almost always approved what the private parties submitted and did not edit them further. *See id.* at 231–32 (Alito, J., dissenting).

---

[13]The final portion of the summary merely lists the members of the petition committee. *See, e.g.*, Ex. 1 to Am. Compl., R. 47, PageID 516.

Also, the claim that the certified summary constitutes Plaintiffs' own protected speech is undermined by the fact that, as the district court acknowledged, *Brown III*, 2025 WL 815754, at *7 n.5, Plaintiffs do not argue the summary requirement or the placement of the Attorney General's certification on the summary raises compelled speech concerns.  In our constitutional tradition, parties often object when the government requires them to convey a political message.  *See, e.g.*, *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977).  And I have no doubt average citizens would be quite alarmed at the prospect of having to carry a government message—here, at the very least, the Attorney General's certification—on their own core political speech, particularly speech that is alleged to be "an essential part of [a person's political] advocacy," Majority Op. at 19.  *Cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974).  Put simply, Plaintiffs have not demonstrated that the certified summary constitutes their own private protected speech.

### B.

*Second*, even if the summary were not government speech, Ohio's law still would not involve any direct regulation of private speech.  It would, at most, trigger a line of First Amendment precedent dealing with unconstitutional conditions where the government creates a public benefit—here, the right to make law through the initiative process—and then limits a private party's ability to use that benefit to convey a private message.  *See United States v. American Library Assn., Inc.*, 539 U.S. 194, 210 (2003) (plurality op.).  In such scenarios, governments retain significant leeway to limit a private party's speech that occurs when the party seeks to use the government benefit to magnify their own speech, even when the limitation imposes content- or viewpoint-based restrictions.  *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 192–200 (1991); *Garcetti v. Ceballos*, 547 U.S. 410, 417–26 (2006).

That is what the Ohio law at issue does.  Ohio's initiative process is a discretionary government program, and the State retains the right to define the program's content- or viewpoint-based contours.  *See, e.g.*, *Rust*, 500 U.S. at 192–200.  For First Amendment analysis, the state initiative process is a benefit, not a right, because, as noted, neither the First

Amendment nor any other provision of the federal Constitution requires that it exist. The citizens of Ohio may amend the State's Constitution via an initiative process only because state, not federal, law allows it. From the vantage point of the First Amendment, therefore, state constitutional initiatives are state-law benefits not federal constitutional rights.[14]

So, even assuming the summary constitutes Plaintiffs' "speech," the certification provision merely limits Plaintiffs' ability to use the government benefit—the petition process—to magnify their own speech, without constraining their ability to speak without aid of the benefit. *Cf. Carrigan*, 564 U.S. at 127 ("This Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message."). Or, put differently, Ohio law merely imposes a restriction on Plaintiffs' speech when they are operating "inside" the government program, created by state law, rather than attempting to use the benefit to restrict Plaintiffs' speech "outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013). Accordingly, to the extent Plaintiffs wish to offer their own summary of their proposed amendments, "they are free to do so without [Ohio's] assistance." *American Library Assn., Inc.*, 539 U.S. at 212. That type of restriction sits well within a state's power.

* * *

To summarize, whether the initiative process is viewed as government speech or a government program, the First Amendment poses no bar to the Attorney General's involvement in that process. Therefore, the Attorney General is likely to prevail in his defense of Ohio's longstanding election regulation.

---

[14]This is not to suggest that, under this view, the federal Constitution falls entirely out of the picture. *See Grant*, 486 U.S. at 424–25; *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006). But here, as explained below, the nature of the government program means that any restriction on Plaintiffs' speech is consistent with the First Amendment because Ohio law merely restricts Plaintiffs' ability to leverage instrumentalities of the government program—here, the certified petition, a government document—to magnify their own speech. Ohio does not "limit discussion of political issues raised in initiative petitions" when Plaintiffs seek to do so outside of a government document. *Grant*, 486 U.S. at 425.

## IV.

Not only is the Attorney General likely to win this lawsuit, but the remaining factors also favor keeping the district court's stay of the preliminary injunction in place.  The harm imposed on Ohio in lifting the stay is immense.  "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).  That is particularly true in the election administration context, where an injunction "seriously and irreparably harm[s]" a state any time it wrongly "bar[s] the State from conducting . . . elections pursuant to a statute enacted by the Legislature."  *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *see also Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring in the grant of stay) ("[T]he State is likely to suffer irreparable harm absent a stay" because "the preliminary injunction disables [the State] from vindicating its sovereign interest in the enforcement of initiative requirements that are likely consistent with the First Amendment.").  And likewise, the public interest "always" favors permitting states to promptly execute their laws, absent a clear showing of unconstitutionality.  *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay) (quoting *Nken*, 556 U.S. at 436).

## V.

One final note.  When a court preliminarily enjoins a state official from enforcing a statute, it does not suspend or revoke the statute's requirements.  "The statute remains in effect; the injunction simply forbids the named defendants to enforce the statute while the court's order remains in place."  Jonathan F. Mitchell, *The Writ-Of-Erasure Fallacy*, 104 Va. L. Rev. 933, 987 (2018).  When a court dissolves an injunction, the enjoined official (or any other state actor) is free to enforce the statute again—both against those who will violate it in the future and against those who violated it in the past, including while the preliminary injunction was in effect.  *See id*. at 938–40, 948, 986–92; *cf.* Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 Sup. Ct. Rev. 193, 209 (noting that "[i]f the final judgment holds the statute valid, dissolves the interlocutory injunction, and denies permanent relief, state officials would be free to prosecute any violation" that occurred while the interlocutory injunction was in effect).

So, if Plaintiffs proceed to collect signatures in support of their petitions without presenting a summary that has been certified by the Attorney General under Ohio Rev. Code § 3519.01(A), they do so at their own peril.  If this court or the Supreme Court later concludes that Ohio's longstanding election regulation does not conflict with federal law, it's possible that, as a matter of Ohio law, any signatures obtained using Plaintiffs' preferred summaries would be invalid.  As a matter of federal law, the district court's preliminary injunction would not provide a defense.  That majority's remedy has the potential to unleash such a "chaotic and disruptive effect" on Ohio's legislative and electoral process is yet another reason to keep the stay in place.  *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (per curiam) (citation omitted).

## VI.

As Judge Thapar has explained, "[w]hen Attorney General Yost enforces the fair-and-truthful certification provision, he isn't directly regulating speech; he's restricting what sorts of citizen initiative proposals can become law."  *Brown II*, 122 F.4th at 608 (Thapar, J., concurring).    And whether Ohio law wishes to make it more difficult to advance certain messages through its legislative process is fundamentally a question of public policy that is committed to "the near-limitless sovereignty of each State to design its governing structure as it sees fit."  *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rts. & Fight for Equal. By Any Means Necessary*, 572 U.S. 291, 327 (2014) (Scalia, J., concurring in the judgment).  Because "there is no authority in the Constitution of the United States . . . for the Judiciary to set aside [Ohio] laws that commit this policy determination to the" Ohio legislature and Attorney General, *id.* at 314 (plurality op.), I see no option but to let the stay remain in place.

Contrary to what the majority claims, this result would not be an "eager[]" endorsement of "dubious conduct" by the Attorney General.  Majority Op. at 19.  Absent a clear command to the contrary, the structure of the state initiative process is a choice the federal Constitution leaves to the people of each state.  Whether the state action before us is uncommonly silly or of the upmost piety, our duty as federal judges here is to faithfully apply the First Amendment.  That federal constitutional provision poses no bar to the Attorney General's challenged actions.  Only state law regulates that conduct.

Therefore, I respectfully dissent.